[Civ. No. 4729. Third Appellate District.—January 26, 1933.]

CALIFORNIA BANK (a Corporation), Respondent, v. ROBERT E. LEAHY et al., Defendants; JOHN A. ECK COMPANY (a Corporation), Appellant.

Harry W. Horton for Appellant.

Swanwich & Donnelly, William B. Himrod and R. B. Whitelaw for Respondent.

PARKER, J., *pro tem.*—The plaintiff, a banking corporation, which had loaned the defendants, produce growers, certain sums of money, filed this suit to recover on promissory notes and obligations of defendants and to foreclose a chattel mortgage given to secure the aforesaid indebtedness.

A receiver was appointed who took possession of the crops, marketed the same and who holds the proceeds. The defendants defaulted and as against them plaintiff made sufficient proof to support a decree of foreclosure which followed.

Intervener, an eastern produce company, appeared in the action claiming an equitable lien upon the crops with a preference of demand against the proceeds of the crops and also claiming damages. The court below found against the intervener and this appeal follows.

A detail of the situation becomes necessary. The defendant grower and producer will be referred to hereinafter, for brevity, as the Leahy Company.

The Leahy Company had been engaged for some years in growing cantaloupes and lettuce in Imperial Valley, California, and in the state of Texas. In connection with its business it borrowed sums of money from plaintiff bank aggregating $130,000; it also borrowed from Eck Company, as an advance upon produce to be grown, the sum of $12,500. On or about April 4, 1924, the Leahy Company made, executed and delivered to plaintiff bank the chattel mortgage herein decreed foreclosed.

The relations between the Leahy Company and intervener began, in so far as the present record indicates, on or about October 1, 1923. On that date a written agreement was entered into between those parties last named, the provisions of which follow: Leahy Company contract to grow and ship to Eck Company seventy-five cars of Shamrock brand cantaloupes at a guaranteed advance of $1.25 per crate, f. o. b. Imperial Valley, California. It is understood that these cantaloupes are to come out of the Westmoreland and Brawley sections with the early shipments from those sections, the contract specifically excluding cantaloupes grown or shipped out of late sections. The Eck Company agreed to make an advance of $200 per car or a total amount

of $15,000, payable one-half on October 10th and the remainder on December 26, 1923. This advance payment was to be deducted from the shipments of cantaloupes to be made. The Eck Company is to handle the cantaloupes and charge for their services seven per cent of the gross amount that the cantaloupes sell for and make returns to Leahy Company for the balance. The Leahy Company further agrees to grow in Imperial Valley and ship fifty cars of lettuce. Eck Company agrees to advance $5,000 on this lettuce contract, which sum was to be paid on the execution of the agreement, Leahy Company to give the notes signed by members of the firm for the amount advanced with interest at six per cent per annum. At the same time another agreement was made, by the terms of which Leahy Company agreed to repay the loan on March 15, 1924.

On or about March 21, 1924, Leahy Company and Eck Company made and entered into another agreement, the terms of which follow: Leahy Company agrees to ship and deliver to Eck Company at Chicago sixty-two cars Shamrock brand cantaloupes during the shipping season of 1924. The price of the cantaloupes is fixed according to size of crate. Eck Company agree to market the produce and to retain for such service seven per cent of the gross, accounting to Leahy Company for net proceeds after deduction of freight, refrigeration, inspection, etc. These cantaloupes are to be grown upon certain specified ranches and Leahy Company agree to ship the third car packed and loaded after the commencement of their shipping season and to ship one car each day during the next nine days and two cars thereafter until the sixty-two cars have been shipped. It is expressly understood and agreed that Eck Company has loaned to Leahy Company $12,500 under the agreement of October 1, 1923, which said loan shall be considered and agreed made as a loan and advance of $200 per car on the sixty-two cars herein agreed to be shipped, it being agreed that Leahy Company should pay to Eck Company $100 to reduce the loan to $12,400. It is understood and agreed that this contract constitutes the full agreement between the parties and supersedes and cancels the agreement of October 1, 1923, and also cancels and supersedes all riders, amendments and supplements thereto, including a certain agreement for the cancellation of the October

agreement and the agreement made at the same time to repay the loan by March 15, 1924.

Under the contract of October 1, 1923, Eck Company was to advance $20,000. Of this amount only $12,500 was advanced. On or about January 29, 1924, intervener's attorney wrote to plaintiff bank as follows:

"Under Eck's contract there is a further advance on the cantaloupe loan due from Eck to Leahy in a very short time, and as Eck Co. does not desire that they have any friction with you or with Leahy, they are anxious to know if the Bank is going to permit Leahy to ship the cars of cantaloupes (seventy-five cars) to them. As the Bank has a chattel mortgage on all the crops to be grown by Leahy Co. you can see that it is very essential that Eck Co. have your attitude in this matter before they go further into the deal. As delay in making their next advance may not bring the best results for all concerned, we would greatly appreciate your very earliest reply."

On February 5, 1924, plaintiff replied to said letter as follows:

"We have your letter relative to further advances to Leahy Co. in accordance with contract entered into by Eck Co. and Leahy Co. under date of October 1st, 1923. We know of no reason why Leahy Co. should not carry out their contract. In other words, the Bank does not expect in any way to exercise any authority in the directing of the shipment of the crop, and as far as we are concerned, it is agreeable to us that they comply with their obligations under the contract."

Thereafter on April 4, 1924, plaintiff bank took the crop mortgage here involved which covered the produce raised on the lands in said mortgage described. On or about June 10, 1924, this action was instituted to foreclose said mortgage and on that date a receiver was appointed who did enter into possession of the crop and market the same.

It is appellant's contention that the contract of October 1, 1923, created an equitable lien in favor of appellant and against the crop to be raised by Leahy to the extent of seventy-five cars. This contention seems to open up the subject of equitable liens, their origin and purpose. But scant authority is presented and much of this beside the

point. The term equitable lien as distinguished from statutory or contractual liens is, like many terms of equity, not definable; that is to say, characteristic of equity itself, we cannot limit the doctrine to formula. The term, however, is somewhat to be understood from the word "lien". This word implies something specific and definite. ■ Whenever, in law or equity, a lien is created or declared there are two things prominently concerned, namely, an obligation and a *res* or *rem* to which or upon which that obligation fastens itself. The theory of equitable lien is not devised as a substitute means of specific performance of every contract.

Let us apply these general principles to the instant case. The Leahy Company was engaged in raising cantaloupes and lettuce in the Imperial Valley. It was likewise engaged in the state of Texas. It maintained one central office and organization through which all business was done and through which all funds passed. All moneys received from any source went into the general business fund without allocation to any territory.

The contract of October 1, 1923, bound the Leahy Company to grow and ship seventy-five cars of cantaloupes which produce was to come from any place within two specified sections. There was no contract of purchase and sale either present or in the future. The Eck Company was a selling agent receiving the cantaloupes on a consignment with an agreed compensation of seven per cent of gross receipts for handling. The advanced money was characterized as a loan and repayment thereof specified as of a date prior to the time the crop could possibly mature. It seems manifest that if the terms of the agreement contemplated discharge of the indebtedness prior to the maturity of the crop it was not the intent of the agreement to look to the crop for payment. There was no evidence that the money advanced by Eck Company ever went into the crop subsequently produced or into the cultivation of the lands from which the crop came. The cases cited by appellant do not support its claim of lien.

In *Hall* v. *Cayot*, 141 Cal. 13 [74 Pac. 299, 301], the court cites Pomeroy's Equity Jurisprudence, as declaring the doctrine as follows:

"Equity looks at the final intent and purpose rather than the form, and if the intent appear to pledge certain property as security for an obligation, the lien follows."

In all of the cited cases there appears something which definitely ties the *res* to the obligation. Either there was a sale with deferred delivery or the thing itself came into existence through funds advanced or paid under an understanding, express or implied, that the obligation incurred should be fastened specifically to the property upon which the lien was asserted. There is, however, an equitable doctrine which seemingly disregards the notion of intent to pledge and proceeds upon the theory of general adjustment of relative rights. The basis of the doctrine is the maxim that equity will deem that done which ought to be done. Yet this doctrine is more than a mere abstraction; it does not contemplate expediency as distinguished from legal rights. In its analysis it is merely another way of stating the older rule that there must be an intent to fasten the obligation to a given thing or the circumstances surrounding must be such that a just or equitable adjustment of the right of the parties contemplated the dedication of the property specifically to the obligation.

Summing up, we conclude that where a commission merchant goes to a general grower, one engaged in producing crops over a large area and enters into a selling agreement on commission and as a part of the agreement loans money to the grower, which money is to be repaid at a time prior to the maturity of the crop, the one thus loaning the money assumes the position of a general creditor. And we hold this to be particularly true in a case such as the present, where the money loaned was used in the general business of the grower with no record showing that the crops upon which a lien is claimed, in anywise directly benefited from the loan. (Pomeroy's Equity Jurisprudence, 4th ed., sec. 1235 et seq.; Jones on Liens, 3d ed., sec. 32; *Bailey* v. *Sward*, 184 Cal. 395 [193 Pac. 952].)

Appellant urges an estoppel against plaintiff based upon the correspondence hereinbefore set forth. It will be noted that the correspondence was after the moneys had been advanced. Further, the correspondence referred only to the agreement of October 1, 1923, which agreement obligated appellant to advance $7,500 additional to the

Leahy Company. It is admitted that no such advancement was made, but that in lieu thereof a new contract was made whereby appellant rescinded entirely the first agreement and agreed to accept merely the sixty-two cars of cantaloupes to cover the loan already made. Without attempting the entire field of estoppel, we quote the trial court's finding, as follows: "That intervener did not rely upon the said statements of plaintiff or any part thereof and did not advance any money to defendants at or after the time of such communications between intervener and plaintiff nor after January 1, 1924, and did not because of any statement or representation of plaintiff alter or change its position to its detriment."

It was further found, upon substantial testimony, that appellant could have contracted for other cantaloupes to take the place of those mentioned in the contract of October 1, 1923, although it could not have received credit thereon for the loan to Leahy Co. It was further found that plaintiff had no notice of the contract of March 21, 1924, and also that intervener has suffered no damage because of any act of plaintiff. It is not pointed out wherein these findings lack evidentiary support excepting the general statement to that effect.

The foregoing findings destroy the claim of estoppel. Complaint is made of errors of the trial court in the admission and rejection of evidence. No authority is cited nor is any argument made in this connection other than to specify the rulings. An examination discloses that the evidence rejected was on objection going more to the form of question and that later in the proceeding, through proper questions the evidence was admitted. This is true excepting in two instances and in these latter instances we agree with the trial court's ruling. We do not detail these claims further for the very good reason that if any error did occur it was without prejudice.

Judgment affirmed.

Pullen, P. J., and Thompson (R. L.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 25, 1933, and an application by appellant to have the cause heard in the

Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 27, 1933.